**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| DENISH BHAVSAR, derivatively on behalf of MICROVAST HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> YANG WU, CRAIG WEBSTER, YEELONG TAN BALLADON, STEPHEN VOGEL, WEI YING, STANLEY WHITTINGHAM, ARTHUR WONG, and YANZHUAN ZHENG, <br><br> Defendants, <br><br> and <br><br> MICROVAST HOLDINGS, INC., <br><br> Nominal Defendant. | Case No.: 4:24-cv-00372 <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Denish Bhavsar ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Microvast Holdings, Inc. ("Microvast" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Yang Wu ("Wu"), Craig Webster ("Webster"), Yeelong Tan Balladon ("Balladon"), Stephen Vogel ("Vogel"), Wei Ying ("Ying"), Stanley Whittingham ("Whittingham"), Arthur Wong ("Wong"), and Yanzhuan Zheng ("Zheng") (collectively, the "Individual Defendants" and with Microvast, "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Microvast, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint

1

against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Microvast, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Microvast's directors and officers from October 19, 2022 through November 20, 2023, both dates inclusive (the "Relevant Period").

2. Microvast is a Delaware transportation-focused, lithium-ion battery technology corporation based near Houston, Texas that purportedly designs, develops, and manufactures battery components and systems primarily for electric commercial vehicles and utility-scale energy storage systems ("ESS"). Although the Company maintains a headquarters in Texas, Microvast conducts much of the Company's operations in the city of Huzhou in the People's Republic of China.

3. Founded in 2006 by Defendant Wu, Microvast operated as a private company until July 26, 2021, when Microvast merged with and into Tuscan Holdings Corporation ("Tuscan"), a special purpose acquisition company ("SPAC"). This merger made Microvast a publicly traded company on the NASDAQ stock market, trading under the ticker symbol "MVST," with redeemable warrants trading under the ticker symbol "MVSTW."

4.      Since introducing its first "ultra-fast battery system" in 2009, Microvast has purportedly developed proprietary technology across an entire battery system, including basic battery cell components such as cathodes, anodes, electrolytes, and separators, as well as cooling systems and software controls for battery packs.

5.      In October 2022, the United States Department of Energy ("DOE") conditionally chose Microvast to receive a proposed $200 million grant intended for funding a proposed polyaramid separator production facility (the "DOE Grant"). Polyaramid is a strong synthetic polymer capable of withstanding extremely high temperatures and is typically intrinsically flame retardant.[1] A Polyaramid separator is an insulating film between the cathode and anode in lithium-ion batteries, used to prevent thermal runway and thus, fire risk, while still allowing ion transfer.[2] For this reason, they are commonly used in large lithium-ion batteries that power electric vehicles.

6.      The truth began to emerge on May 23, 2023, before the market opened, when *Reuters* published an article entitled "US will not award $200 mln grant for Microvast battery company." The article revealed that the DOE would not be awarding the DOE Grant to Microvast. Later that day, Charisma Troiano, a spokeswoman for the DOE, stated that the DOE "can confirm that it has elected to cancel negotiations and not to award Microvast funds from this competitive funding opportunity."

7.      The DOE did not provide a specific reason for denying the DOE Grant but did provide in a statement that the DOE "maintains a rigorous review process prior to the release of

---

[1] Examples of polyarmids include p-phenylenediamine and terephthalic acid, commonly known as Kevlar® and Twaron®, and m-phenylenediamine and isophthalic acid, commonly known as Nomex®. Polyarmids are generally used in firefighting clothing and insulating papers.
[2] Energy Tech, *Microvast to open its first EV Battery Separator plant in Kentucky*, (Apr. 2, 2023) https://www.energytech.com/energy-storage/article/21263165/microvast-to-open-its-first-ev-battery-separator-plant-in-kentucky.

any awarded funds, and it is not uncommon for entities selected to participate in award negotiations" to not receive a federal grant.

8.     On this news, the Company's share price declined by $0.80 per share—approximately 36%—from its May 22, 2023 closing price of $2.20 per share to close on May 23, 2023 at $1.40 per share.

9.     However, the full truth would not emerge until approximately six months later, on the morning of November 21, 2023, when J Capital Research issued a report entitled "MVST: Empty Facilities and a Grant Loss That Was Probably Hidden: Another China Hustle" (the "MVST Report"). The MVST Report revealed that the Individual Defendants knew Microvast would not be receiving the DOE Grant months before *Reuters* reported the denial on May 23, 2023. The MVST Report further revealed that "the majority of [Microvast]'s sales may be fake," that "Chinese customers account for 57% of revenue in 2023" despite aerial drone surveillance indicating Microvast's Chinese factory "show[ing] almost no activity," that Microvast "has disappeared from Chinese procurement lists," that "local competitors say the company is not making discernible sales," and that Microvast's reported production backlog was "dubious."

10.    On this news, the Company's share price dropped $0.33 per share, or 25%, from its November 20, 2023 closing price of $1.30 per share to close on November 21, 2023 at $0.98 per share.

11.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) there

was a considerable likelihood that Microvast would not receive the DOE Grant after the DOE conducted due diligence on the Company; (2) negotiations between Microvast and the DOE had concluded and the DOE Grant offer was revoked; (3) Microvast overstated its business prospects; and (7) the Company failed to maintain internal controls. As a result of the foregoing, Microvast's public statements were materially false and misleading at all relevant times.

12.     Moreover, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact while one of the Individual Defendants engaged in insider trading while the Company's stock was artificially inflated from the Individual Defendants' false and misleading statements. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

13.     In light of the Individual Defendants' misconduct—which has subjected the Company, and certain of its directors and officers to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Texas (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars.

14.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and

misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of certain directors' and officers' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

<u>**JURISDICTION AND VENUE**</u>

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. In addition, the Company's principal executive offices are in this District.

## PARTIES

### Plaintiff

20.    Plaintiff Bhavsar is a current shareholder of Microvast. Plaintiff purchased Company common stock on December 28, 2020 when the Company was known as Tuscan. When the business combination between Tuscan and the Company closed on July 23, 2021, Plaintiff became a shareholder of Microvast. Thus, the Plaintiff has continuously held Company common stock since December 28, 2020.

### Nominal Defendant Microvast

21.    Microvast is a Delaware corporation with its principal executive offices at 12603 Southwest Freeway, Suite 300, Stafford, Texas 77477. Microvast's shares trade on the NASDAQ under the ticker symbol "MVST."

### Defendant Wu

22.    Defendant Wu founded the Company in 2006. Since then, he has served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board. Previously, he served as President of the Company from January 10, 2023 until August 3, 2023. According to the Company's Schedule 14A filed with the SEC on August 18, 2023 (the "2023 Proxy Statement"), as of August 10, 2023, Defendant Wu beneficially owned 85,036,953 shares of the Company's common stock, representing 27.5% of the Company's outstanding common stock, thus making Defendant Wu a controlling shareholder of the Company.[3] Given that the price per share of the

---

[3] Defendant Wu also holds the power to nominate directors to the Company's Board. The 2023 Proxy Statement provides the following: "In connection with the Business Combination, on July 23, 2021, the Company, Mr. Yang Wu and the Sponsor entered into an agreement (the "Stockholders Agreement") which provides that Mr. Wu will have the right, but not the obligation, to nominate for election to the Board at every meeting of the stockholders of the Company at which directors are elected a number of individuals (rounded up to the nearest whole number) equal to (a) the total number of directors, multiplied by (b) the quotient obtained by dividing the shares of common stock beneficially owned by Mr. Wu by the total number of outstanding shares of

Company's common stock at the close of trading on August 10, 2023 was $2.02, Defendant Wu owned approximately $172 million worth of Microvast stock as of that date.

23.     For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Wu received $982,892 in total compensation from the Company, including $542,895 in salary and $439,997 in stock awards.

24.     The 2023 Proxy Statement stated the following about Defendant Wu:

Yang Wu was elected to our Board as a Class III Director on July 23, 2021. Mr. Wu is the founder of Microvast and has been its Chairman, Chief Executive Officer and director since its inception in October 2006. Mr. Wu served as President of the Company from January 10, 2023 to August 3, 2023. From 2000 to 2006, Mr. Wu served as chief executive officer at Omex Environmental Engineering Co., Ltd., a water treatment company, which he founded and was acquired by Dow Chemical Company in 2006. From 1996 to 2000, Mr. Wu served as chief executive officer and founder of Omex Engineering and Construction Inc. Prior to Omex Engineering and Construction, from 1989 to 1996, Mr. Wu was the founder of World Wide Omex, Inc., an agent for a large oilfield service company. Mr. Wu received his bachelor's degree from Southwest Petroleum University, Chengdu.

**Defendant Webster**

25.     Defendant Webster has served as the Company's Chief Financial Officer ("CFO") since July 23, 2021. Previously, Defendant Webster served as a Company director from July 23, 2021 until his appointment as CFO on July 1, 2022. According to the 2023 Proxy Statement, as of August 10, 2023, Defendant Webster beneficially owned 648,410 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of

---

common stock (each, a "Wu Director") less the number of Wu Directors then serving on the Board and whose terms in office are not expiring at such meeting. Mr. Wu, Yanzhuan Zheng, Stanley Whittingham and Arthur Wong were nominated by Mr. Wu as the initial Wu Directors. The Stockholders Agreement provides that any increase or decrease in the number of directors will require the affirmative vote of the Wu Directors. Under the terms of the Stockholders Agreement, there are currently four Wu Directors."

trading on August 10, 2023 was $2.02, Defendant Webster owned approximately $1.3 million worth of Microvast stock as of that date.

26.     For the 2022 Fiscal Year, Defendant Webster received $3,673,231 in compensation from the Company, including $309,908 in salary, $159,993, $3,190,000 in option awards, and $13,330 in all other compensation.

27.     The 2023 Proxy Statement stated the following about Defendant Webster:

Craig Webster was appointed as our Chief Financial Officer on April 14, 2022. He served on our Board from July 23, 2021 to July 1, 2022. Prior to that, he also served as a director of Microvast, Inc. from 2012 to 2021. Mr. Webster joined the Ashmore Group, a dedicated Emerging Markets investment manager, in January 2005, holding positions as General Counsel from 2007 to 2010 and Global Head of its Special Situations Funds from 2013 to 2018. During his time at Ashmore, he was a member of the firm's investment committees for its special situations funds and Latam Infrastructure Fund. He previously served as a director for BTS Group Holdings PCL (BKK: BTS) and Petron Corporation (Philippines:PCOR). Prior to the Ashmore Group, Mr. Webster worked as a lawyer specializing in cross-border M&A and corporate restructurings with Weil, Gotshal & Manges from 1998 to 2003. Mr. Webster began his career as a lawyer with DLA (now DLA Piper) in 1996. Mr. Webster holds a Bachelor of Arts degree in Marketing from the University of Stirling and the CPE and LPC qualifications from the College of Law (York).

**Defendant Balladon**

28.     Defendant Balladon has served as a Company director since July 1, 2022. Defendant Balladon also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. According to the 2023 Proxy Statement, as of August 10, 2023, Defendant Balladon beneficially owned 36,036 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 10, 2023 was $2.02, Defendant Balladon owned approximately $72,793 worth of Microvast stock as of that date.

29.     For the 2022 Fiscal Year, Defendant Balladon received $122,500 in compensation from the Company, including $42,500 in salary and $80,000 in stock awards.

30.     The 2023 Proxy Statement stated the following about Defendant Balladon:

Yeelong Tan Balladon was appointed to the Board as a Class III Director effective July 1, 2022. Ms. Balladon has served as the lead independent trustee of the board of the Ashmore Funds since 2010 and as lead independent trustee since 2014. The Ashmore Funds is a registered U.S. mutual funds complex dedicated to investing in emerging markets. Ms. Balladon also served as a non-executive director of Pacnet Limited from 2008–2015 and Jasper Investments from 2011–2015. Ms. Balladon was an associate and subsequently a partner at Freshfields Bruckhaus Deringer, an international law firm, from 1982–1988 and 1994–2009. She retired from the partnership in 2009. Ms. Balladon holds an LL.B. from the National University of Singapore and is legally professionally qualified in Singapore, England & Wales and the New York Bar.

**Defendant Vogel**

31.     Defendant Vogel has served as a Company director since July 23, 2021. Defendant Vogel also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of August 10, 2023, Defendant Vogel beneficially owned 4,240,304 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 10, 2023 was $2.02, Defendant Vogel owned approximately $8.6 million worth of Microvast stock as of that date.

32.     For the 2022 Fiscal Year, Defendant Vogel received $160,000 in compensation from the Company, including $80,000 in salary and $80,000 in stock awards.

33.     The 2023 Proxy Statement stated the following about Defendant Vogel:

*Stephen A. Vogel* was elected to the Board as a Class I Director on July 23, 2021. He previously served as Tuscan's Chairman and Chief Executive Officer since its inception. He serves as Chairman and Chief Executive Officer of Tuscan Holdings Corp. II ("Tuscan II"), a blank check company like Tuscan that has been searching for a target business with which to consummate an initial business combination. He served as President and a Director of Twelve Seas Investment Company, a blank check company, from May 2018 until the completion of its business combination with Brooge Holdings Limited in December 2019. From December 2016 until February 2018, Mr. Vogel was Executive Chairman of Forum Merger Corporation, a blank check company that completed its initial public offering in April 2017.

Forum completed its initial business combination in February 2018 with C1 Investment Corp. and in connection with the consummation of the business combination changed its name to ConvergeOne Holdings, Inc. (NASDAQ: CVON). He has served as General Partner of Vogel Partners, LLP, a private investment firm, since 1996. Mr. Vogel began his career in 1971 as President, Chief Executive Officer and co-founder of Synergy Gas Corp., a retail propane distribution company. After selling Synergy Gas Corp. to Northwestern Corp. in 1995, Mr. Vogel co-founded EntreCapital Partners, a private equity firm that focused on companies facing operational or management challenges, and served until 1999. Additionally, he was a venture partner at EnerTech Capital Partners, an energy focused venture capital firm, from 1999 to 2002, and an operating partner at Tri-Artisan Capital Partners, LLC, an investment bank, from 2004 to 2006. Mr. Vogel also served as Chief Executive Officer of Grameen America, a not-for-profit organization that provides microloans to low-income borrowers in the U.S., from 2008 to 2013. He served on the board of Netspend (NASDAQ: NTSP), a leader for prepaid stored value platforms, from 2011 to 2013. Mr. Vogel was a member of the Board of Trustees at Montefiore Medical Center and Children's Hospital for over 20 years and served on the Board of Trustees at Lighthouse International, a non-profit organization. Mr. Vogel is a past Trustee of the Horace Mann School and previously served on the board of directors of the National Propane Gas Association. Mr. Vogel received a Bachelor of Science degree from the Syracuse University School of Management.

### Defendant Ying

34.     Defendant Ying has served as a Company director since July 23, 2021. Defendant Ying also serves as a member of the Audit Committee and as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of August 10, 2023, Defendant Ying beneficially owned 84,900 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 10, 2023 was $2.02, Defendant Ying owned approximately $171,498 worth of Microvast stock as of that date.

35.     For the 2022 Fiscal Year, Defendant Ying received $149,999 in compensation from the Company, including $69,999 in salary and $80,000 in stock awards.

36.     The 2023 Proxy Statement stated the following about Defendant Ying:

*Wei Ying* was elected to the Board as a Class I Director on July 23, 2021. Mr. Ying has been a director of Microvast, Inc. since June 2017. Since December 2014, Mr. Ying has been a managing partner and director of CDH Shanghai Dinghui Bai Fu

Investment Management Co., Ltd., a key investment manager entity under CDH Investment, and some of its affiliates. Mr. Ying has served as a director of CHTC Fong's Industries Company Limited (HKG: 0641) since September 2011, a director of Fountain Set (Holdings) Limited (HKG: 0420) since January 2015, a director of Giant Network Group Co., Ltd. (002558.SZ) since May 2016, a director of Zhongsheng Group Holdings Limited (OTCMKTS: ZSHGY) since December 2016, a director of Beijing East Environment Energy Technology Co., Ltd. (NEEQ: 831083) since July 2017, a director of Yunji Inc. (NASDAQ: YJ) since February 2018, and a director of Sinocelltech Group Limited (688520:Shanghai) since February 2019. Mr. Ying has also served as a director of Guolian Industry Investment Fund Management (Beijing) Co., Ltd. since February 2014, a director of Huaian Yuchu Transportation Co., Ltd. since August 2016, a director of Zhejiang Liji Electronics Co., Ltd. since December 2020, a director of Ane (Cayman) Inc. and its affiliates since August 2016, a director of Ningbo Dingcheng Investment Management Co., Ltd. since March 2018, a director of Shenzhen Tajirui Biomedical Co., Ltd. since July 2018, a director of Ningbo Dingyi Asset Management Co., Ltd. since October 2015, and a director of Shanghai Jiexin VC Investment Management Co., Ltd. since January 2017. Mr. Ying received a Bachelor's Degree in Economics from Zheijiang Gohgshang University and a Master of Business Administration from the University of San Francisco School of Management.

**Defendant Whittingham**

37.     Defendant Whittingham served as a Company director from July 23, 2021 until his resignation from the Board on October 9, 2023. According to the 2023 Proxy Statement, as of August 10, 2023, Defendant Whittingham beneficially owned 53,575 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 10, 2023 was $2.02, Defendant Whittingham owned approximately $108,222 worth of Microvast stock as of that date.

38.     For the 2022 Fiscal Year, Defendant Whittingham received $115,000 in compensation from the Company, including $35,000 in salary and $80,000 in stock awards.

39.     The 2023 Proxy Statement stated the following about Defendant Whittingham:

*M. Stanley Whittingham* was elected to the Board as a Class II Director on July 23, 2021. He has been a distinguished professor of chemistry and director at Binghamton University since 1988. He has also served as a director of Magnis Energy Technologies (OTCMKTS: MNSEF)(ASE: MNS) since November 2016.

Mr. Whittingham's research interest and expertise includes elucidation of the limiting mechanisms, chemical and structural, of intercalation reactions using a variety of synthetic and characterization approaches, both in-situ and ex-situ. He was awarded the Nobel Prize in Chemistry in 2019 for his work with lithium-ion batteries. He obtained his Ph.D. in Chemistry, his Master of Arts and his Bachelor of Arts degrees from Oxford University.

**Defendant Wong**

40.     Defendant Wong has served as a Company director since July 23, 2021. Defendant Wong also serves as the Chair of the Audit Committee and as a member of the Nominating and Governance Committee. According to the 2023 Proxy Statement, as of August 10, 2023, Defendant Wong beneficially owned 57,902 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 10, 2023 was $2.02, Defendant Wong owned approximately $116,962 worth of Microvast stock as of that date.

41.     For the 2022 Fiscal Year, Defendant Wong received $161,000 in compensation from the Company, including $81,000 in salary and $80,000 in stock awards.

42.     The 2023 Proxy Statement stated the following about Defendant Wong:

*Arthur Wong* was elected to the Board as a Class II Director on July 23, 2021. Mr. Wong currently serves as an independent director and Chairman of the audit committee of Daqo New Energy Corp. (NYSE: DQ) and Canadian Solar Inc. (NASDAQ: CSIQ). From March 2020 to March 2022, Mr. Wong served as an independent director of Tarena International, Inc. (NASDAQ: TEDU). From 2008 to 2018, Mr. Wong served as the Chief Financial Officer for Asia New-Energy, Nobao Renewable Energy, GreenTree Inns Hotel Management Group and Beijing Radio Cultural Transmission Company Limited, sequentially. From 1982 to 2008, Mr. Wong worked for Deloitte Touche Tohmatsu in Hong Kong, San Jose and Beijing over various periods of time, with his last position as a partner in the Beijing office. Mr. Wong received a bachelor's degree in applied economics from the University of San Francisco and a higher diploma of accountancy from Hong Kong Polytechnic University. He is a member of the American Institute of Certified Public Accountants, the Association of Chartered Certified Accountants and the Hong Kong Institute of Certified Public Accountants.

**Defendant Zheng**

43.     Defendant Zheng has served as a Company director since July 23, 2021. Previously, Defendant Zheng served as the Company's CFO from July 23, 2021 until April 14, 2022. According to the 2023 Proxy Statement, as of August 10, 2023, Defendant Zheng beneficially owned 3,105,109 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 10, 2023 was $2.02, Defendant Zheng owned approximately $6.2 million worth of Microvast stock as of that date.

44.     For the 2022 Fiscal Year, Defendant Zheng received $429,209 in compensation from the Company, including $309,214 in salary, $59,996 in RSUs, and $59,999 in PSUs.

45.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Zheng made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 14, 2023 | 1,000,000 | $1.30 | $1,300,000 |

Thus, in total, before the fraud was exposed, he sold 1,000,000 shares of Company stock on inside information, for which he received approximately $1,300,000 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

46.     The 2023 Proxy Statement stated the following about Defendant Zheng:

*Yanzhuan Zheng* was elected to the Board as a Class III Director on July 23, 2021. Mr. Zheng was appointed as the Company's Chief Financial Officer on July 31, 2021 and, on April 14, 2022, Mr. Zheng transitioned from his role as Chief Financial Officer of the Company to advisor. Mr. Zheng also served as Microvast, Inc.'s Chief Financial Officer and as a director since 2010. Prior to joining Microvast, Mr. Zheng joined Quantum Energy Partners, a Houston-based private equity firm, in 2007. Mr. Zheng began his career with Arthur Anderson LLP in 1997. Mr. Zheng holds a Master of Science degree in accounting from Texas A&M University and is a Certified Public Accountant and a CFA Charter holder.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

47.     By reason of their positions as officers, directors, and/or fiduciaries of Microvast and because of their ability to control the business and corporate affairs of Microvast, the Individual Defendants owed Microvast and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Microvast in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Microvast and its shareholders so as to benefit all shareholders equally.

48.     Each director and officer of the Company owes to Microvast and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Microvast, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50.     To discharge their duties, the officers and directors of Microvast were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Microvast, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Microvast's Board at all relevant times.

52.     As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

53.     To discharge their duties, the officers and directors of Microvast were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Microvast were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Microvast's own Code of Ethics;

(b)        conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)        remain informed as to how Microvast conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)        establish and maintain systematic and accurate records and reports of the business and internal affairs of Microvast and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)        maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Microvast's operations would comply with all applicable laws and Microvast's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)        exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)        refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)        examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54.     Each of the Individual Defendants further owed to Microvast and the shareholders the duty of loyalty requiring that each favor Microvast's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

55.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Microvast and were at all times acting within the course and scope of such agency.

56.     Because of their advisory, executive, managerial, directorial, and controlling positions with Microvast, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

57.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Microvast.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal

adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

60.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Microvast was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

61.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

62.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Microvast, and was at all times acting within the course and scope of such agency.

## MICROVAST'S CODE OF ETHICS AND CORPORATE GOVERNANCE

### Microvast's Code of Ethics

63.     Microvast's Code of Ethics "sets forth requirements for honest and ethical conduct, ensures compliance with applicable governmental laws, rules and regulations and provides

accountability for adherence" to the Code of Ethics. The Code of Ethics "applies to the directors, officers and employees of the Company ("Covered Persons") and should be provided to and followed by the Company's agents, representatives and consultants. Violations of this Code may result in disciplinary action, varying from reprimand to termination."

64.     The Code of Ethics further states that the "Company's good name and reputation depend, to a very large extent, upon you taking personal responsibility for maintaining and adhering to the policies and guidelines set forth in this Code. Your conduct on behalf of the Company must be guided by the ethical principles, policies and guidelines set forth in this Code."

65.     Regarding "Conflicts of Interest," the Code of Ethics provides, in relevant part:

A conflict of interest is a situation where a Covered Person's personal or professional interests (or those of an immediate family member or other close relative or friend or any other person who may act on such Covered Person's behalf) can affect his or her ability to act in the Company's best interests or interfere (or appear to interfere) with his or her personal objectivity and obligations to the Company. All Covered Persons should engage in honest and ethical conduct, including avoiding any actual or apparent conflicts of interest. All Covered persons are charged with acting in the Company's best interests at all times. Employees and officers may not hold outside employment that interferes with their job performance at the Company. Officers and directors should also refer to the Company's Related Party Transactions Policy for additional information. Consistent with the rules of the Nasdaq Stock Market ("Nasdaq") and Section XIV below, any waiver of this conflict of interest policy for a director or executive officer of Microvast Holdings may only be made by the Board of Directors of Microvast Holdings (the "Board"), and any such waiver should be promptly disclosed to the stockholders of Microvast Holdings.

All Covered Persons are obligated to continually evaluate their personal and employment situations and promptly report to the Compliance Officer any material transaction or relationship that could be expected to give rise to an actual or apparent conflict of interest.

If you become aware of a business or financial opportunity as part of your work with the Company, you are not permitted to use any such information or usurp that opportunity for your own personal gain. You may not use Company property or information or your position with the Company for personal gain and should not compete with the Company or any of its affiliates directly or indirectly.

66.     Regarding "Record-Keeping," the Code of Ethics provides:

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions, and it documents and records business expenses accurately. Questionable expenses should be discussed with the appropriate personnel in the Company's accounting department. All of the Company's books, records, accounts and financial statements are maintained in reasonable detail, appropriately reflect its transactions and conform both to applicable legal requirements and to the Company's system of internal controls.

The Company avoids exaggeration, derogatory remarks, guesswork or inappropriate characterizations of people and companies in its business records and communications. The Company maintains its records according to its record retention policies. In accordance with those policies, in the event of any litigation or governmental investigation concerning the Company's records or communications, please consult with the Compliance Officer if you have any questions.

67.     Regarding "Public Reporting," the Code of Ethics provides, in relevant part:

Microvast Holdings is a public company and, as a result, files reports and other documents with the United States Securities and Exchange Commission (the "SEC") and Nasdaq, on which its common stock trades. In addition, Microvast Holdings issues press releases and makes other public statements in accordance with its Corporate Disclosure Policy that include financial and other information about the Company's business, financial condition and results of operations. Microvast Holdings endeavors to make full, fair, accurate, timely and understandable disclosures in reports and documents it files with, or submits to, the SEC and in its press releases and public communications.

The Company requires cooperation and open communication with its auditors. It is illegal to take any action to fraudulently influence, coerce, manipulate or mislead any auditor engaged in the performance of an audit of the Company's financial statements.

The laws and regulations applicable to filings made with the SEC, including those applicable to accounting matters, are complex. While the ultimate responsibility for the information included in these filings rests with Company management, numerous other employees participate in the preparation of these filings or provide information included in these filings. The Company maintains disclosure controls and procedures to ensure that the information included in these filings is collected and communicated to Company management in order to permit timely disclosure of such information.

If you are requested to provide, review or certify information in connection with the preparation of a filing to be made with the SEC, you must provide the requested

information in a full, accurate and timely manner. Moreover, even in the absence of a specific request, you should report any significant information that you believe should be considered for disclosure in Microvast Holdings' filings with the SEC.

68.     Regarding "Competition and Fair Dealing," the Code of Ethics provides:

The Company competes fairly and honestly. The Company does not engage in unethical or illegal business practices such as stealing proprietary information, possessing trade secret information that was obtained without the owner's consent or inducing disclosure of this type of information by past or present employees of other companies.

69.     Regarding "Compliance with Laws, Rules and Regulations," the Code of Ethics

provides:

The Company is obligated to comply with all applicable laws, rules and regulations, including with respect to human rights, forced labor, child labor, human trafficking, bribery, discrimination, harassment and pay equity. The Company strives to conduct its business ethically and in a way that demonstrates respect for globally recognized human rights and the dignity of all people. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company. Company management is also required to promote compliance with the Code by all employees and to abide by Company standards, policies and procedures.

70.     Regarding "Insider Trading," the Code of Ethics provides, in relevant part:

Trading on inside information is a violation of federal securities law. Covered Parties in possession of material, non-public information about the Company or companies with whom it does business must abstain from trading or advising others to trade in the respective company's securities from the time that they obtain such material, non-public information until adequate public disclosure has been made regarding such information. Information is considered "material" if there is a substantial likelihood that a reasonable investor would consider it important in making a decision to buy, sell or hold a security or where such information is likely to have a significant effect on the market price of the security. To use non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal. Covered Parties who trade stock based on material, non-public information can be personally liable for damages totaling up to three times the profit made or loss avoided by the respective Covered Party.

71.     Regarding "Reporting Illegal or Unethical Behavior," the Code of Ethics provides, in relevant part:

> In order to encourage the reporting of illegal or unethical behavior (including violations of this Code), the Company keeps all reports confidential and does not allow retaliation for good faith reports of possible misconduct by others. It is also the duty of the Company to cooperate in internal investigations of alleged misconduct. If you observe or suspect any corrupt activity, please contact the Compliance Officer immediately to report such activity. The Company does not tolerate retaliation against anyone who makes such a report in good faith.

72.     Regarding "Waivers" of the Code of Ethics, the Code of Ethics provides:

> Consistent with Nasdaq rules, only the Board may waive a provision of this Code for the executive officers or directors of Microvast Holdings, and any waiver should be promptly disclosed to the stockholders of Microvast Holdings. Waivers of this Code for any other Company employee may be made only by the Chief Executive Officer or the Compliance Officer, and then only under special circumstances.

73.     In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including, but not limited to, violations of Section 14(a) of the Exchange Act, breaches of fiduciary duty, gross mismanagement, unjust enrichment, waste of corporate assets, and abuse of control. Moreover, one of the Individual Defendants violated the Code of Ethics by engaging in insider trading. In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC.

***Audit Committee Charter***

74.     The Company's Audit Committee Charter states that the "purposes" of the Audit

Committee are to:

> • oversee the accounting and financial reporting processes of the Company and the
> audits of the Company's financial statements;
>
> • take, or recommend that the Board take, appropriate action to oversee (1) the
> qualifications, independence and performance of the Company's independent
> auditors, and (2) the performance of the Company's internal audit function;
>
> • prepare the report required by the rules of the United States Securities and
> Exchange Commission (the "SEC") to be included in the Company's annual proxy
> statement;
>
> • review any proposed related party transactions and approve, ratify or disallow
> each such proposed transaction;
>
> • review any proposed pre-arranged trading plans to be entered into by Covered
> Persons (as defined in the Insider Trading Policy) pursuant to SEC rule 10b5-1(c)
> and approve, ratify or disallow each such proposed trading plan;
>
> • approve reimbursement of expenses incurred by Company management in
> identifying potential target businesses; and
>
> • oversee and review the Company's guidelines and policies that govern the process
> by which the Company's exposure to risk is assessed and managed by Company
> management.

75.     The Audit Committee Charter also describes the Audit Committee's

responsibilities. The Audit Committee Charter states that the Audit Committee shall review the

Company's public filings:

> The Committee shall review and discuss with Company management (including
> the Senior Accounting Executives) and with the independent auditors the
> Company's annual and quarterly audited financial statements, including (a) all
> critical accounting policies, practices and controls used or to be used by the
> Company and any other matters required by Sections 302 and 404 of the Sarbanes-
> Oxley Act of 2002 and the rules promulgated thereunder by the SEC, (b) the
> Company's disclosures under "Management's Discussion and Analysis of
> Financial Condition and Results of Operations" prior to the filing of the Company's
> Annual Report on Form 10-K and (c) any significant financial reporting issues that
> have arisen in connection with the preparation of such audited financial statements.

76.     The Audit Committee Charter states that the Audit Committee shall review the following, in relevant part:

(i)     any analyses prepared by Company management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements. The Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements and the treatment preferred by the independent auditors. The Committee may also consider other material written communications between the independent auditors and Company management, such as any management letter or schedule of unadjusted differences;

(ii)     major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies, as well as the Company's disclosures regarding internal controls;

(iii)     major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

(iv)     the effects of regulatory and accounting initiatives, as well as offbalance sheet transactions and structures, on the financial statements of the Company.

77.     The Audit Committee Charter states that the Audit Committee shall discuss the following with the CEO and CFO, in relevant part:

The Committee shall discuss with the Chief Executive Officer and Chief Financial Officer of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving Company management or other employees who have a significant role in the Company's internal control over financial reporting.

78.     Regarding the Company's "Unaudited Quarterly Financial Statements," the Audit Committer Charter provides:

The Committee shall discuss with Company management and the independent auditors, prior to the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related

disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) such issues as may be brought to the Committee's attention by the independent auditors pursuant to Statement on Auditing Standards No. 100 and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements.

79.      Regarding the Company's "Earnings Press Releases," the Audit Committer Charter

provides:

The Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

80.      Regarding the Company's "Risk Assessment and Management," the Audit

Committer Charter provides:

• The Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by Company management.

• In connection with the Committee's discussion of the Company's risk assessment and management guidelines, the Committee may discuss or consider the Company's major financial and accounting risk exposures or other exposures and the steps that Company management has taken to monitor and control such exposures.

• The Committee shall periodically meet with the Compliance Officer to review and discuss any reports of wrongdoing or inappropriate conduct received directly by the Compliance Officer or through the Company's Whistleblower Hotline and any risk exposures in connection therewith.

81.      Regarding the Company's "Legal and Regulatory Compliance," the Audit

Committer Charter provides:

• The Committee shall discuss with Company management or outside legal counsel and the independent auditors and review with the Board the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements. After these discussions, the Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

• The Committee shall discuss with Company management any legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its compliance policies and procedures.

82.     In violation of the Audit Committee Charter, the Individual Defendants sitting on the Audit Committee during the Relevant Period failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

83.     Microvast is a Delaware transportation-focused, lithium-ion battery technology corporation based near Houston, Texas that purportedly designs, develops, and manufactures battery components and systems primarily for electric commercial vehicles and utility-scale ESS. Although the Company maintains a headquarters in Texas, Microvast conducts much of the Company's operations in Huzhou in the People's Republic of China.

84.     Founded in 2006 by Defendant Wu, Microvast operated as a private company until July 26, 2021, when Microvast merged with and into Tuscan, a SPAC. This merger made Microvast a publicly traded company on the NASDAQ stock market, trading under the ticker symbol "MVST," with redeemable warrants trading under the ticker symbol "MVSTW."

85.     Since introducing its first "ultra-fast battery system" in 2009, Microvast has purportedly developed proprietary technology across an entire battery system, including basic battery cell components such as cathodes, anodes, electrolytes, and separators, as well as cooling systems and software controls for battery packs.

86.     In October 2022, the DOE conditionally chose Microvast to receive the proposed $200 million DOE Grant, to be used for a proposed polyaramid separator production facility. Polyaramid is a strong synthetic polymer capable of withstanding extremely high temperatures and is typically intrinsically flame retardant.[4] A Polyaramid separator is an insulating film between the cathode and anode in lithium-ion batteries, used to prevent thermal runway and thus, fire risk, while still allowing ion transfer.[5] For this reason, they are commonly used in large lithium-ion batteries that power electric vehicles.

87.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) there was a considerable likelihood that Microvast would not receive the DOE Grant after the DOE conducted due diligence on the Company; (2) negotiations between Microvast and the DOE had concluded and the DOE Grant offer was revoked; (3) Microvast overstated its business prospects; and (7) the Company failed to maintain internal controls. As a result of the foregoing, Microvast's public statements were materially false and misleading at all relevant times.

**False and Misleading Statements Made During the Relevant Period**

*October 19, 2020 Press Release*

---

[4] Examples of polyarmids include p-phenylenediamine and terephthalic acid, commonly known as Kevlar® and Twaron®, and m-phenylenediamine and isophthalic acid, commonly known as Nomex®. Polyarmids are generally used in firefighting clothing and insulating papers.
[5] Energy Tech, *Microvast to open its first EV Battery Separator plant in Kentucky*, (Apr. 2, 2023) https://www.energytech.com/energy-storage/article/21263165/microvast-to-open-its-first-ev-battery-separator-plant-in-kentucky.

88.    On October 19, 2020, the Company issued a press release announcing the DOE

Grant, in relevant part:

> Today, the White House will announce that Microvast's thermally stable *polyaramid separator manufacturing plant proposal was selected as a recipient of a $200 million grant from the U.S. Department of Energy's Battery Materials Processing and Battery Manufacturing initiative.*

***November 2, 2022 Press Release***

89.    On November 2, 2022, the Company issued another press release about receiving

the DOE Grant, depicting the Company's selection to receive the DOE Grant as an "honor," among

other things, in relevant part:

> It is an honor to be recognized by the DOE and collaborate with General Motors on this important effort to strengthen and accelerate domestic battery supply chain and manufacturing initiatives in North America. ***This grant will enable Microvast to accelerate its plans to onshore critical battery component manufacturing processes, including mass production of our patented polyaramid separator technology,"*** said Dr. Wenjuan Mattis, Chief Technology Officer at Microvast. "We expect the safety advantages of our innovative, highly thermally stable polyaramid separators to transform high-energy lithium-ion battery development and drive significant value for the industry," she continued.
>
> *       *       *
>
> The $200 million DOE grant, together with a more than $300 million investment from the companies, is expected to ***support the construction of a new separator manufacturing facility in the U.S. Microvast expects the new separator facility to supply battery components to its existing battery cell manufacturing facility in Clarksville, Tennessee, as well as other customers across the commercial, specialty and passenger electric vehicle (EV) markets, energy storage systems (ESS) and other applications.***
>
> *       *       *
>
> About DOE Funding
>
> Microvast, in collaboration with General Motors, ***is a recipient of the first set of projects funded by the President's Bipartisan Infrastructure Law*** to expand domestic manufacturing of batteries for EVs and the electrical grid and for materials and components currently imported from other countries.
>
> *       *       *

*As part of the selection process for the DOE grant, Microvast has been invited to negotiate the specific terms of the grant funding. Once the terms have been finalized, the grant funding will remain subject to the conditions precedent and other terms and conditions to be agreed during these negotiations.*

*November 10, 2022 Press Release*

90.     On November 10, 2022, Microvast issued a press release announcing the

Company's third quarter of 2022 financial performance for the period ended September 30, 2022.

The press release stated the following, in relevant part:

**Results for Q3 2022**

Microvast generated revenue of $38.6 million in Q3 2022, compared to $36.9 million for the third quarter ended September 30, 2021 ("Q3 2021"), an increase of 4.7%.

Gross profit was $2.0 million in Q3 2022, compared to a gross loss of $35.9 million in Q3 2021, resulting in a 102.5 percentage point improvement in gross margin from negative 97.3% in Q3 2021 to 5.2% in Q3 2022. Non-GAAP adjusted gross profit was $4.0 million in Q3 2022, compared to non-GAAP adjusted gross loss of $33.6 million in Q3 2021, resulting in a 101.3 percentage point improvement in non-GAAP adjusted gross margin from negative 91.1% in Q3 2021 to 10.2% in Q3 2022.

Operating expenses were $39.6 million in Q3 2022 compared to $78.0 million in Q3 2021. The change in operating expenses was largely due to share-based compensation expense being $38.7 million lower in Q3 2022 compared to Q3 2021.

Net loss was $36.5 million in Q3 2022 compared to net loss of $116.5 million in Q3 2021. Non-GAAP adjusted net loss was $17.4 million in Q3 2022 compared to non-GAAP adjusted net loss of $65.1 million in Q3 2021. Non-GAAP adjusted EBITDA was negative $12.6 million in Q3 2022 compared to non-GAAP adjusted EBITDA of negative $58.8 million in Q3 2021.

* * *

**2022 Outlook**

Microvast confirms year over year revenue growth for the year ended December 31, 2022 ("FY 2022") is expected to be in the range of 35% to 40%.

*The Company's backlog at the end of Q3 2022 was $140.6 million, an increase of 166.8% compared to $52.7 million at the end of Q3 2021.*

The Company expects capital expenditures for the remainder of FY 2022 to be approximately $90.0 million to $120.0 million, *which will be primarily used in connection with the Company's ongoing manufacturing capacity expansions in Huzhou, China and Clarksville, Tennessee.*

**November 10, 2022 Form 10-Q**

91.     Also on November 10, 2022, Microvast filed its quarterly report for the quarter ended September 30, 2022 on Form 10-Q with the SEC (the "Q3 2022 10-Q"). The Q3 2022 10-Q was signed by Defendant Webster and contained certifications, signed by Defendants Wu and Webster, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the Q3 2022 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

92.     The Q3 2022 10-Q also contained the following about the DOE Grant:

**U.S. Department of Energy Grant Funding - Polyaramid Separator Facility**

In October 2022, the Company was notified by the U.S. Department of Energy ("DOE") that it had been selected, in collaboration with General Motors, *to negotiate and receive $200 million in grant funding* as part of President Biden's Bipartisan Infrastructure Law under the DOE's Battery Materials Processing and Battery Manufacturing initiative. *The grant funding, together with additional funding to be arranged by the Company, is expected to support the construction of a new polyaramid separator manufacturing facility in the U.S. The specific terms and conditions of the grant funding remain under negotiation*. Once finalized, the grant funding will remain subject to the conditions precedent and other terms and conditions to be agreed between the Company and the DOE.

**March 16, 2023 Press Release**

93.     On March 16, 2023, Microvast issued a press release announcing the Company's fourth quarter of 2022 and fiscal year ended December 31, 2022 financial performance. The press release stated the following, in relevant part:

"We are pleased to report another quarter of stable growth, and *we closed 2022 with a record backlog of $410.5 million*, which puts us in a great position to execute our high growth plans for the years ahead," said Craig Webster, Mircovast's Chief Financial Officer. "*As we bring additional capacity online this year, we will add approximately $1 billion of new revenue potential annually for our new 53.5Ah cell, which already accounts for over 80% of our backlog*. We believe that the strong demand we are seeing along with the anticipated benefits of IRA puts us on a path to achieve profitability within the next two to three years."

**Full Year 2022 Highlights**

• Revenue of $204.5 million, compared to $152.0 million in 2021, an increase of 35%

• Gross profit increased by 121% to $9.1 million from gross loss of $42.7 million in 2021; Non-GAAP adjusted gross profit of $16.8 million, compared to non-GAAP adjusted gross loss of $38.5 million in 2021; Non-GAAP adjusted gross margin increased to 8.2%, up from negative 25.3% in 2021

• Operating expenses of $170.7 million, compared to $157.4 million in 2021; Adjusted operating expenses of $96.5 million, compared to $97.6 million in 2021

• Net loss of $158.2 million, compared to net loss of $206.5 million in 2021; Non-GAAP adjusted net loss of $77.3 million, compared to non-GAAP adjusted net loss of $135.0 million in 2021

• Adjusted EBITDA of negative $56.7 million, compared to Adjusted EBITDA of negative $109.3 million in 2021

• Backlog as of December 31, 2022 was $410.5 million, representing growth of 258.5% compared to $114.5 million in backlog as of December 31, 2021 and sequential growth of 192.0% compared to $140.6 million in backlog at September 30, 2022.

• Capital expenditures of $150.9 million, compared to $87.9 million in 2021, driven by investments in manufacturing capacity expansions in Huzhou, China and Clarksville, Tennessee
• Cash, cash equivalents, restricted cash and short-term investment of $327.7 million as of December 31, 2022

*March 16, 2023 Annual Report*

94.     Also on March 16, 2023, Microvast filed its annual report for the 2022 Fiscal Year

on Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K was signed by Defendants Wu,

Webster, Zheng, Wong, Whittingham, Vogel, Balladon, and Ying and contained SOX certifications, signed by Defendants Wu and Webster, attesting to the accuracy of the financial statements contained in the 2022 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

95.   The 2022 10-K stated the following about the Microvast receiving the DOE Grant:

In October 2022, we were notified by the U.S. Department of Energy ("DOE") that we had been selected, in collaboration with General Motors, **to receive $200 million in grant funding as part of the DOE's Battery Materials Processing and Battery Manufacturing initiative pursuant to the recently enacted infrastructure law, subject to negotiation of specific terms**. Once finalized, the grant funding will remain subject to certain conditions precedent and other terms and conditions to be agreed between us and the DOE. **The grant funding is expected to support the construction of a new polyaramid separator manufacturing facility in the U.S.** To complete this project, we will need to obtain additional financing. We cannot assure you that such financing will be available on acceptable terms. See "Risks Related to Our Business and Industry— We may be unable to meet our future capital requirements and we may require additional capital to support business growth, and this capital might not be available on acceptable terms, or at all" and "Risks Related to Our Business and Industry—**Our $200 million grant from the DOE remains subject to negotiation of specific terms, and completion of the project the grant supports will require us to obtain additional financing** which may not be available at all or on acceptable terms; continued availability of grant funding is uncertain and contingent on our compliance with the requirements of the grants we have or may receive in the future."

\* \* \*

*Expand our manufacturing capacity to meet growing demand*. With the construction and expansion of facilities and resources in the U.S., Europe and China, our manufacturing facilities will be located in close proximity to our customers in each major region. We plan to prudently expand our manufacturing capacity to capture the large and growing market opportunity for electric vehicles and ESS solutions, especially in the U.S. and Europe. Our capacity expansions will be in phases based on our ongoing assessment of medium- and long-term demand for our products. **The aggregate manufacturing capacity is approximately 3 GWh per year as of December 31, 2022. After adding 4.0 GWh of new capacity in 2023**, we will strategically review some of our existing manufacturing equipment and optimize that to best address anticipated future demand for our products. **We plan to achieve a total manufacturing capacity of 7 GWh and 11 GWh per year by December 31, 2023 and 2025**, respectively, to support growing demand for our

existing products. ***In addition, we plan to expand our manufacturing capacity in the U.S. for the polyaramid separator in connection with a recent award we received in collaboration with General Motors for a $200 million grant from the DOE***.

***May 9, 2023 Press Release***

96.     On May 9, 2023, Microvast issued a press release announcing the Company's first quarter of 2023 for the period ending March 31, 2023 financial performance. The press release stated the following, in relevant part:

**Microvast Reports First Quarter 2023 Financial Results**

• Revenue increased 28.1% year over year to $47.0 million, exceeding original guidance

• Adjusted gross margin increased to 13.5%

• ***Achieved record backlog of $486.7 million***

* * *

"In the first quarter, we delivered stronger than anticipated year-over-year revenue growth, led by the initial production ramp up of several of our commercial vehicle customers in Europe" said Yang Wu, Microvast's Founder, Chairman, President and Chief Executive Officer. "***We are very pleased to have completed our expansion and have begun trial production in Huzhou, China which adds 2GWh of production capacity for our new 53.5Ah cell. In addition, our Clarksville, Tennessee facility remains on track for start of production in the fourth quarter, bringing our total 53.5Ah capacity additions this year to 4GWh. Customer adoption of our new cell is very strong and over 50% of our new capacity in Huzhou is already under contract.***"

"We are pleased to report another quarter of solid growth with improving gross margins and ***another record backlog of $486.7 million, which really underpins our revenue plan for this year, and gives us the conviction to raise our guidance,***" said Craig Webster, Microvast's Chief Financial Officer. "***We are very encouraged by the level of customer engagement and interest in our Clarksville plant***, which along with anticipated IRA credits, is providing multiple project finance opportunities."

**Results for Q1 2023**

• Revenue of $47.0 million, compared to $36.7 million in Q1 2022, an increase of 28.1%

• Gross margin increased to 10.3% from gross margin of 0% in Q1 2022; Non-GAAP adjusted gross margin increased to 13.5%, up from 5.2% in Q1 2022

• Operating expenses of $36.2 million, compared to $43.4 million in Q1 2022; Adjusted operating expenses of $19.8 million, compared to $31.1 million in Q1 2022

• Net loss of $29.6 million, compared to net loss of $43.8 million in Q1 2022; Non-GAAP adjusted net loss of $11.7 million, compared to non-GAAP adjusted net loss of $29.1 million in Q1 2022

• Net loss per share of $0.10 compared to net loss per share of $0.15 in Q1 2022; Non-GAAP adjusted net loss per share of $0.04, compared to non-GAAP adjusted net loss per share of $0.10 in Q1 2022

• Adjusted EBITDA of $(7.5) million in Q1 2023, compared to Adjusted EBITDA of $(23.1) million in Q1 2022

• ***Backlog as of March 31, 2023 was $486.7 million, representing growth of 302.9% compared to $120.8 million in backlog as of March 31, 2022 and sequential growth of 18.6% compared to $410.5 million in backlog at December 31, 2022***.

• Capital expenditures of $35.9 million, compared to $41.1 million in Q1 2022, and were driven by investments in manufacturing capacity expansions in Huzhou, China and Clarksville, Tennessee

• Cash, cash equivalents, restricted cash and short-term investments equalled [SIC] $285.8 million as of March 31, 2023, compared to $327.7 million as of December 31, 2022 and $470.7 million as of March 31, 2022

***May 9, 2023 Form 10-Q***

97.    Also on May 9, 2023, Microvast filed its quarterly report for the first quarter of 2023 on Form 10-Q with the SEC (the "Q1 2023 10-Q"). The Q1 2023 10-Q was signed by Defendant Webster and contained SOX certifications, signed by Defendants Wu and Webster, attesting to the accuracy of the financial statements contained in the Q1 2023 10-Q, the disclosure

of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

98.     The Q1 2023 10-Q also contained the following about the DOE Grant:

In October 2022, we were notified by the U.S. Department of Energy ("DOE") that we had been selected, in collaboration with General Motors, to receive $200 million in grant funding as part of the DOE's Battery Materials Processing and Battery Manufacturing initiative pursuant to the recently enacted infrastructure law, ***subject to negotiation of specific terms and conditions***. Once finalized, the grant funding will remain subject to certain conditions precedent and other terms and conditions to be agreed between us and the DOE. ***The grant funding is expected to support the construction of a new polyaramid separator manufacturing facility in Hopkinsville, Kentucky***. To complete this project, we will need to obtain additional financing. We cannot assure you that such financing will be available on acceptable terms.

### The Truth Begins to Emerge as False and Misleading Statements Continue

99.     The truth began to emerge on May 23, 2023, before the market opened, *Reuters* published an article entitled "US will not award $200 mln grant for Microvast battery company." The article revealed that the DOE would not be awarding the DOE Grant to Microvast. The *Reuters* article revealed the following, in relevant part:

The U.S. Energy Department told lithium battery company Microvast Holdings it ***will not award it a $200 million grant***, a source familiar with the matter said on Monday, after lawmakers cited concerns over its alleged links to China's government.

Two Republican lawmakers criticized the decision to grant the funding in a letter last December to Energy Secretary Jennifer Granholm, saying Microvast had ties to the Chinese Communist Party (CCP) that raised "***serious concerns about the department's ability to protect U.S. taxpayer dollars.***"

100.    Later that day, Charisma Troiano, a spokeswoman for the DOE, stated that the DOE "can confirm that it has elected to cancel negotiations and not to award Microvast funds from this competitive funding opportunity."

36

101. The DOE did not provide a specific reason for denying the DOE Grant but did provide in a statement that the DOE "maintains a rigorous review process prior to the release of any awarded funds, and it is not uncommon for entities selected to participate in award negotiations" to not receive a federal grant. However, the *Reuters* article cited Frank Lucas, Republican Congressman of Oklahoma, who stated that the DOE Grant revocation was "a win for taxpayers and American businesses."

102. On this news, the Company's share price declined by $0.80 per share—approximately 36%—from its May 22, 2023 closing price of $2.20 per share to close on May 23, 2023 at $1.40 per share.

***May 24, 2023 Press Release***

103. The following day, on May 24, 2023, Microvast issued a press release in response to the DOE revoking the DOE Grant. The press release stated the following, in relevant part:

> Yang Wu, Microvast's founder, chairman, President, and Chief Executive Officer, said "***the Company is surprised by the DOE's decision to withdraw the grant, which was designed to help build a new facility in Kentucky that would employ hundreds of people. Microvast is based in Texas, its shares are traded on Nasdaq, and the operations for our global business are centralized in the U.S. Neither the Chinese government nor the Chinese Communist Party has any ownership in the Company, nor do they control or influence Company operations in any way***." The Company is therefore considering all of its options."
>
> * * *
>
> "***Our priority remains completing our battery manufacturing facility in Clarksville, Tennessee. We are about half-way through our over $300 million investment in the plant,***" said Craig Webster, Microvast's Chief Financial Officer. "This facility is a key business focus for us and will be a key contributor to our growth in the coming years. The DOE decision does not impact our previously provided financial guidance. ***Based on our backlog of orders, we expect revenue in the U.S this year to be in excess of $100 million. The decision also has no impact on our liquidity position, and in fact, it gives us more flexibility on how we plan to undertake our expansion initiatives in the U.S***."

***May 25, 2023 Microvast Fact Sheet***

104.    On May 25, 2023, Microvast published a "fact sheet" that further commented on the DOE's revocation of the DOE Grant:

Microvast is:

• Based in Texas

• Listed on the Nasdaq

• A global company centralized in the U.S.

• Founded by an American citizen

Microvast is not:

• Owned in whole or in part by the Chinese government

• Owned in whole or in part by the Chinese Communist Party

• Controlled by the Chinese government

• Controlled by the Chinese Communist Party

* * *

 The withdrawal of a grant by the U.S. Department of Energy will not impact our expansion plans already underway for cell manufacturing.

• The company will remain on track to increase the number of employees we have in the U.S., especially military veterans.

• The company is committed to help the U.S. expand its battery supply chain and manufacturing initiatives.

• The DOE decision does not alter our plans to commercialize our polyaramid separator.

• The company will continue to invest in a pilot line that will add 10 million square meters of capacity this year.

• There will be some timing impact on bringing the separator technology to market.

• Based on our backlog of orders, the company expects revenue in the U.S this year to be more than $100 million.

• The DOE decision has no impact on our liquidity position, and in fact, it gives us more flexibility on how we plan to undertake our expansion initiatives in the U.S.

• Our leading 53.5Ah battery cells and packs are expected to be our primary revenue growth driver in the coming years.

• Our separator technology was only anticipated to modestly contribute to revenue starting in 2025.

105.    On June 30, 2023, Microvast issued a press release announcing that the Company no longer planned to construct the anticipated mass polyaramid separator production facility in Kentucky. The press release stated, in relevant part:

> ***Microvast had diligently pursued the establishment of the polyaramid separator manufacturing plant*** with the aim of expanding its operations, creating local jobs, and contributing to the growth of the Hopkinsville, KY community. Microvast's proprietary polyaramid separator is a vitally important technology, as it significantly improves the safety of lithium-ion batteries.
>
> ***Due to recent developments, Microvast reassessed the viability in proceeding with the separator project***. "Our commitment to build the world's first mass polyaramid separator production facility in the U.S. remains unchanged," said Craig Webster, the Company's Chief Financial Officer. But he added, "Given market conditions, including interest rates doubling in the last year, we have decided to not move forward with our construction plans for the plant and will focus on our core business for now."

***August 7, 2023 Press Release***

106.    On August 7, 2023, Microvast issued a press release announcing the Company's second quarter of 2023 for the period ending June 30, 2023 financial performance. The press release stated the following, in relevant part:

• Revenue increased 16.4% year over year to $75.0 million, exceeding guidance

• ***Achieved record backlog of $675.9 million, up 541.9% year over year***

• Gross margin increased from 7.5% to 15.3%, a 7.8 percentage point improvement year over year

* * *

"In the second quarter, we delivered strong year-over-year revenue growth, led by the continued production *ramp up of our commercial vehicle customers in Europe and Asia Pacific*." said Yang Wu, Microvast's Founder, Chairman, President and Chief Executive Officer. "We are incredibly pleased to have begun shipping qualified 53.5Ah cells from our 2GWh Huzhou, China facility during the second quarter. With Huzhou now in ramp-up phase, our execution focus for the remainder of the year is to bring Clarksville into trial production in Q4."

"The stand-out performance from the quarter is the improving gross margin and backlog setting a new record of $675.9 million," said Craig Webster, Microvast's Chief Financial Officer. "*We anticipate further upticks in our backlog through the rest of the year supported by new energy storage and commercial vehicle projects, which would lead to very high utilization rates on our new capacity expansions*."

**Results for Q2 2023**

• Revenue of $75.0 million, compared to $64.4 million in Q2 2022, an increase of 16.4%

• *Backlog as of June 30, 2023 was $675.9 million, representing a growth of 541.9% compared to $105.3 million in backlog as of June 30, 2022 and sequential growth of 38.9% compared to $486.7 million in backlog at March 31, 2023*

• Gross margin increased to 15.3% from gross margin of 7.5% in Q2 2022; Non-GAAP adjusted gross margin increased to 17.3%, up from 10.4% in Q2 2022

• Operating expenses of $39.0 million, compared to $50.4 million in Q2 2022; Adjusted operating expenses of $22.7 million, compared to $21.7 million in Q2 2022

• Net loss of $26.1 million, compared to net loss of $44.2 million in Q2 2022; Non-GAAP adjusted net loss of $8.3 million, compared to non-GAAP adjusted net loss of $14.9 million in Q2 2022

• Net loss per share of $0.08 compared to net loss per share of $0.15 in Q2 2022; Non-GAAP adjusted net loss per share of $0.02, compared to non-GAAP adjusted net loss per share of $0.05 in Q2 2022

• Adjusted EBITDA of $(4.2) million in Q2 2023, compared to Adjusted EBITDA of $(9.2) million in Q2 2022

• Capital expenditures of $57.7 million, compared to $26.9 million in Q2 2022, and primarily driven by our capacity expansion at Clarksville, Tennessee

• Cash, cash equivalents, restricted cash and short-term investments equaled $195.8 million as of June 30, 2023, compared to $327.7 million as of December 31, 2022, and $396.9 million as of June 30, 2022

***August 7, 2023 Form 10-Q***

107.    That same day, on August 7, 2023, Microvast filed its quarterly report for the second quarter of 2023 on Form 10-Q with the SEC (the "Q2 2023 10-Q"). The Q2 2023 10-Q was signed by Defendant Webster and contained SOX certifications, signed by Defendants Wu and Webster, attesting to the accuracy of the financial statements contained in the Q2 2023 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

108.    The Q2 2023 10-Q also contained the following about the Company's backlog, in relevant part:

> As of June 30, 2023, ***we had a backlog of approximately $675.9 million for our battery systems, equivalent to approximately 2,559.5 MWh.*** So far, we have used $332.4 million of the proceeds from the Business Combination that was completed in July 2021 to expand our manufacturing facilities and for the purchase of property and equipment associated with our existing manufacturing and R&D facilities.

***August 18, 2023 Proxy Statement***

109.    On August 18, 2023, Microvast filed the 2023 Proxy Statement with the SEC. Defendants Wu, Balladon, Vogel, Whittingham, Wong, Ying, and Zheng solicited the 2023 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

110.    The 2023 Proxy Statement called for Company shareholders to, *inter alia*: (1) reelect Defendants Wong and Whittingham to the Board; and (2) ratify Deloitte Touche Tohmatsu Certified Public Accountants LLP as the Company's independent auditor for the fiscal year ending December 31, 2023.

111.     The 2023 Proxy Statement stated the following regarding the Board's risk oversight

functions:

> Our Audit Committee is responsible for overseeing our risk management process.
> Our Audit Committee focuses on our general risk management strategy and the
> most significant risks facing us and oversees the implementation of risk mitigation
> strategies by management. Our Audit Committee is apprised of particular risk
> management matters in connection with its general oversight and approval of
> corporate matters and significant transactions.
>
> Our Compensation Committee is principally responsible for establishing,
> overseeing and administering our compensation plans and policies for our
> executive officers, including our equity incentive plans. Our Compensation
> Committee is also responsible for overseeing risks related to our compensation
> programs and practices. Our Compensation Committee has assessed the risk
> associated with our compensation policies and practices for our employees and
> determined that the risks associated with such policies and practices are not
> reasonably likely to have a material adverse effect on us. Our Compensation
> Committee utilizes compensation practices that it believes discourage our
> employees from excessive risk-taking that could be reasonably likely to have a
> materially adverse effect on us.

112.     The 2023 Proxy Statement contained the following description of Microvast's

"Commitment to Sound Corporate Governance":

> We are committed to adhering to corporate governance practices that meet
> applicable U.S. corporate governance standards. Our Board has adopted guidelines
> that serve as a flexible framework within which our Board and its committees
> operate (the "Corporate Governance Guidelines"). These Corporate Governance
> Guidelines cover a number of areas including the size and composition of the
> Board, board membership criteria and director qualifications, director
> responsibilities, board agenda, meetings of independent directors, committee
> responsibilities and assignments, board member access to management and
> independent advisors, director communications with third parties, director
> compensation, director orientation and continuing education, evaluation of senior
> management and management succession planning.

113.     The 2023 Proxy Statement also stated that the Company has "adopted a code of

ethics applicable to our directors, officers and employees."

114.     The 2023 Proxy Statement was materially misleading because it failed to disclose

that: (1) contrary to the 2023 Proxy Statement's descriptions of the Board's risk oversight function

and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements to the investing public, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly interested in their re-election to the Board to allow themselves to continue breaching their fiduciary duties to Microvast.

115.    The 2023 Proxy Statement also failed to disclose that: (1) there was a considerable likelihood that Microvast would not receive the DOE Grant after the DOE conducted due diligence on the Company; (2) negotiations between Microvast and the DOE had concluded and the DOE Grant offer was revoked; (3) Microvast overstated its business prospects; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Microvast's public statements were materially false and misleading at all relevant times.

116.    As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders reelected Defendants Wong and Whittingham to the Board, allowing them to continue breaching their fiduciary duties to Microvast and ratified Deloitte Touche Tohmatsu Certified Public Accountants LLP as independent auditor.

### *November 9, 2023 Press Release*

117.    On November 9, 2023, Microvast issued a press release announcing the Company's third quarter of 2023 for the period ending September 30, 2023 financial performance. The press release stated the following, in relevant part:

Results for Q3 2023

•Revenue of $80.1 million, compared to $38.6 million in Q3 2022, an increase of 107.5% •***Backlog as of September 30, 2023 was $678.7 million, representing a growth of 382.7% compared to $140.6 million in backlog as of September 30, 2022***

•Gross margin increased to 22.3% from gross margin of 5.2% in Q3 2022; Non-GAAP adjusted gross margin increased to 24.2%, up from 10.2% in Q3 2022

•Operating expenses of $44.7 million, compared to $39.6 million in Q3 2022; Adjusted operating expenses of $30.3 million, compared to $22.3 million in Q3 2022

•Net loss of $26.2 million, compared to net loss of $36.5 million in Q3 2022; Non-GAAP adjusted net loss of $10.3 million, compared to non-GAAP adjusted net loss of $17.4 million in Q3 2022

•Net loss per share of $0.08 compared to net loss per share of $0.12 in Q3 2022; Non-GAAP adjusted net loss per share of $0.03, compared to non-GAAP adjusted net loss per share of $0.06 in Q3 2022

•Adjusted EBITDA of $(5.3) million in Q3 2023, compared to Adjusted EBITDA of $(12.6) million in Q3 2022

•Capital expenditures of $59.9 million, compared to $16.8 million in Q3 2022, and primarily driven by capacity expansion at our Clarksville, Tennessee facility

***November 9, 2023 Form 10-Q***

118.     That same day, on August 7, 2023, Microvast filed its quarterly report for the third quarter of 2023 on Form 10-Q with the SEC (the "Q3 2023 10-Q"). The Q3 2023 10-Q was signed by Defendant Webster and contained SOX certifications, signed by Defendants Wu and Webster, attesting to the accuracy of the financial statements contained in the Q3 2023 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

119.     The Q3 2023 10-Q also contained the following about the Company's backlog, in relevant part:

> **As of September 30, 2023, we had a backlog of approximately $678.7 million for our battery systems, equivalent to approximately 2,526.1 MWh**. So far, we have used $392.4 million of the proceeds from the Business Combination that was completed in July 2021 to expand our manufacturing facilities and for the purchase of property and equipment associated with our existing manufacturing and R&D facilities.

120.    The statements identified in ¶¶ 88-98, 103-108, 117-119 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) there was a considerable likelihood that Microvast would not receive the DOE Grant after the DOE conducted due diligence on the Company; (2) negotiations between Microvast and the DOE had concluded and the DOE Grant offer was revoked; (3) Microvast overstated its business prospects; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Microvast's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

121.    On the morning of November 21, 2023, when J Capital Research issued a report entitled "MVST: Empty Facilities and a Grant Loss That Was Probably Hidden: Another China Hustle" (the "MVST Report"). The MVST Report revealed that the Individual Defendants knew Microvast would not be receiving the DOE Grant months before *Reuters* reported the denial on May 23, 2023:

> We suspect MVST knew a DOE $200 mln grant for a U.S. factory addition had been rescinded but failed to inform investors until the information hit Reuters months later, and MVST had no choice but to disclose.

122.    The MVST Report stated that Microvast, which had previously announced that the DOE Grant would be put towards the construction of a mass polyaramid production facility in Clarksville, Tennessee, told Clarksville as early as February 2023 that the Company would not be constructing its polyaramid facility in Clarksville.

123.    The MVST Report explained that certain members of the U.S. Congress were concerned about Microvast receiving the DOE Grant in light of the Company's ties to the People's Republic of China. Specifically, the MVST Report stated that on December 7, 2022, and again on

January 25, 2023, the Chair of the House Committee on Science, Space, and Technology sent a letter to Jennifer Granholm, Secretary of the DOE, expressing concern over the selection of Microvast for a DOE Grant:

> In a letter sent to the Department on December 7, 2022, and again on January 25, 2023, the Committee highlighted some of the most egregious connections between Microvast and the CCP,[4,5] including the fact that nearly 80% of Microvast's assets are located in China that the company has disclosed that the Chinese government "exerts substantial influence over the manner in which we must conduct our business activities and may intervene, at any time and with no notice."[6] Our previous letters have a longer list of troubling facts about Microvast, all of which are publicly available and easily accessible and should have come up in any vetting process.
>
> On February 1, 2023, DOE issued an interim response to the Science Committee to describe in general terms its post-award grant vetting policy, noting that DOE would not provide more information on the status of these awards until a certain review phase had been completed.
>
> March 9, 2023 letter to DOE Secretary Granholm

124.    The MVST Report also stated that on February 16, 2023, *Bloomberg* corroborated this account, reporting that ""Microvast's links to China have drawn outrage from lawmakers," and "Funds are in 'post-selection' review."

125.    The MVST Report further revealed that Microvast had not disclosed that most of the Company's revenue came from China:

> MVST submitted a 240-page grant application on May 16, 2022 and issued many interim announcements. *As far as we can tell, the grant application did not mention China or say that 67% of revenue and assets were in China.*

126.    The MVST Report also revealed that most of the Company's sales figures were fraudulent:

> We think *the majority of MVST's sales may be fake. MVST's Chinese customers account for 57% of revenue in 2023, but the China factory shows almost no activity. Our drone videos and photos confirm that. MVST China has disappeared from Chinese procurement lists, and local comeptitors [SIC] say the company is not making discernible sales. We are skeptical of the revenue shown in local financial statements.*

127.     Additionally, J Capital Research conducted aerial surveillance with drones of the

Company's Huzhou, China factory. The MVST Report revealed that Microvast's activity in China

was practically nonexistent:

> Photos and drone videos, along with interviews, indicate that ***MVST's huge factory in Huzhou, China is almost entirely idle. We counted six cars in the compound and two people walking about but no trucks or apparent product.***
>
> ***We believe MVST's China plants have basically been abandoned***. MVST has three plants close to one another in the same development zone in Huzhou. Interviews plus visits to the perimeter indicate that not much is going on.

128.     The MVST Report also revealed that the Company has not made any procurement

announcements since 2017 in China:

> We have searched for procurement announcements by Chinese companies or by MVST about Chinese buyers and can identify nothing since 2017. ***In 2021, MVST mentioned several Chinese companies with which it cooperates, but those were old announcements, and we found no comment by those companies inside China. Yet for the first nine months of 2023, the company reported that 57% of its sales were from customers located in China, with even higher proportions reported in 2020, 2021, and 2022***.

129.     The MVST Report also revealed that Microvast does not have the manufacturing

capacity in China the Company claimed it had:

> MVST claims to be spending somewhere around $250 mln on a plant in Huzhou, China. ***But in five years, according to our sources, construction has not started***. Chinese job boards show that MVST Huzhou is now hiring for a number of positions. But ***we could not find evidence of significant staffing in 2019-2022.***

130.     The MVST Report also determined that Microvast's backlog is "dubious":

> We question the company's reported backlog, currently $678.7 mln. ***Backlog growth is much higher than revenue growth. There was a $189 mln jump in Q2 2023, but the only visible addition came from a December agreement with REE Automotive – whose entire revenue is less than $1 mln***. Regardless, based on the company's track record, this could end up being a backlog of future losses.

131.    The MVST Report elaborated, stating that "[g]rowth in backlog has been stunningly high, but revenue growth has not matched it." The MVST Report included the following chart:



132.    The MVST Report further stated the following about the Company's backlog:

Much of the backlog is reportedly for the new 53.5Ah battery, and mostly for U.S. and European customers. But there are dozens of companies that offer this battery technology, and even if the backlog is real - which we doubt - we are skeptical that MVST can compete with a company like Panasonic or CATL. Company filings also state that MVST faces intense competition from other Chinese battery manufacturers, some of which have state support. Regardless, from the company's track record, this could easily be just a backlog of future losses, which is no cause for celebration.

133.    On this news, the Company's share price dropped $0.33 per share, or 25%, from its November 20, 2023 closing price of $1.30 per share to close on November 21, 2023 at $0.98 per share.

## DAMAGES TO MICROVAST

134.   As a direct and proximate result of the Individual Defendants' misconduct, Microvast has lost and expended, and will continue to lose and expend, many millions of dollars.

135.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

136.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

137.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

138.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

139.   As a direct and proximate result of the Individual Defendants' conduct, Microvast has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

140.   Plaintiff brings this action derivatively and for the benefit of Microvast to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of Microvast, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof.

141.    Microvast is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

142.    Plaintiff is, and has been at all relevant times, a shareholder of Microvast. Plaintiff will adequately and fairly represent the interests of Microvast in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

143.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

144.    A pre-suit demand on the Board of Microvast is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following six individuals: Defendants Wu, Ying, Zheng, Vogel, Balladon, and Wong (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to three of six Directors who are on the Board at the time this action is commenced.

145.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

146.     Moreover, all of the Director-Defendants solicited the 2023 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

147.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Microvast to issue materially false and misleading statements. Specifically, the Director-Defendants caused the Company to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

148.     Additional reasons that demand on Defendant Wu is futile follow. Defendant Wu has served as the Company's CEO, Chairman of the Board, and a controlling shareholder since he founded the Company in 2006. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Wu with his principal occupation for which he receives substantial compensation. As CEO and Chairman of the Board, Defendant Wu was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the statements he personally made in numerous press releases during the Relevant Period and the statements in the 2022 10-K, which he signed and signed SOX certifications for. Defendant Wu further signed SOX certifications for the Q3 2022 10-Q, the Q1 2023 10-Q, and the Q2 2023 10-Q, all of which contained false and misleading statements. In addition, he solicited the 2023 Proxy Statement and the false and misleading statements contained therein contributed to the reelection of Defendants Wong and Whittingham to the Board, who were

breaching their fiduciary duties to the Company. As the Company's controlling shareholder, highest officer and trusted Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Wu is a defendant in the Securities Class Action. For these reasons, Defendant Wu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149.     Additional reasons that demand on Defendant Ying is futile follow. Defendant Ying has served as a Company director since July 23, 2021. Defendant Ying also serves as a member of the Audit Committee and as a member of the Compensation Committee. In particular, he is incapable of considering, independently and disinterestedly, to cause the Company to take action against Defendant Wu, who as CEO would be able to remove Defendant Ying from his directorship. In addition, Defendant Ying personally made false and misleading statements in multiple press releases during the Relevant Period and signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. Moreover, he solicited the 2023 Proxy Statement and the false and misleading statements contained therein contributed to the reelection of Defendants Wong and Whittingham to the Board, who were breaching their fiduciary duties to the Company.  As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Ying breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.    Additional reasons that demand on Defendant Zheng is futile follow. Defendant Zheng has served as a Company director since July 23, 2021. Previously, Defendant Zheng served as the Company's CFO from July 23, 2021 until April 14, 2022. In particular, he is incapable of considering, independently and disinterestedly, to cause the Company to take action against Defendant Wu, who as CEO would be able to remove Defendant Zheng from his directorship. In addition, Defendant Zheng personally made false and misleading statements in multiple press releases during the Relevant Period and signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. Moreover, he solicited the 2023 Proxy Statement and the false and misleading statements contained therein contributed to the reelection of Defendants Wong and Whittingham to the Board, who were breaching their fiduciary duties to the Company. Additionally, Defendant Zheng engaged in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Zheng breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151.    Additional reasons that demand on Defendant Wong is futile follow. Defendant Wong has served as a Company director since July 23, 2021. Defendant Wong serves as the Chair of the Audit Committee and as a member of the Nominating and Governance Committee. In

particular, he is incapable of considering, independently and disinterestedly, to cause the Company to take action against Defendant Wu, who as CEO would be able to remove Defendant Wong from his directorship. In addition, Defendant Wong personally made false and misleading statements in multiple press releases during the Relevant Period and signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. Moreover, he solicited the 2023 Proxy Statement and the false and misleading statements contained therein contributed to his reelection to the Board, allowing him to continue breaching his fiduciary duties to the Company.  As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Wong breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on Defendant Vogel is futile follow. Defendant Vogel has served as a Company director since July 23, 2021. Defendant Vogel also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. In particular, he is incapable of considering, independently and disinterestedly, to cause the Company to take action against Defendant Wu, who as CEO would be able to remove Defendant Vogel from his directorship. In addition, Defendant Vogel personally made false and misleading statements in multiple press releases during the Relevant Period and signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. Moreover, he solicited the 2023 Proxy Statement and the false and misleading statements contained therein contributed to the reelection of Defendants Wong and Whittingham to the Board,

who were breaching their fiduciary duties to the Company.  As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Vogel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153.    Additional reasons that demand on Defendant Balladon is futile follow. Defendant Balladon has served as a Company director since July 1, 2022. Defendant Balladon also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. In particular, she is incapable of considering, independently and disinterestedly, to cause the Company to take action against Defendant Wu, who as CEO would be able to remove Defendant Balladon from her directorship. In addition, Defendant Balladon personally made false and misleading statements in multiple press releases during the Relevant Period and signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. Moreover, she solicited the 2023 Proxy Statement and the false and misleading statements contained therein contributed to the reelection of Defendants Wong and Whittingham to the Board, who were breaching their fiduciary duties to the Company.  As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Balladon breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

154.    Additional reasons that demand on the Board is futile follow.

155.    Defendants Zheng, Wong, and Balladon are beholden to Defendant Wu, as Defendant Wu personally nominated each of them to the Board. Indeed, the 2023 Proxy Statement calls Defendants Zheng, Wong, and Balladon the "Wu Directors." Including Defendant Wu himself, there are four Wu Directors currently on the Board, constituting a majority of the six-person Board. For these reasons, Defendants Zheng, Wong, and Balladon are beholden to Defendant Wu, and cannot independently and disinterestedly consider a demand against themselves and Defendant Wu. Thus, demand is further excused as to Defendants Zheng, Wong, and Balladon.

156.    Defendants Zheng, Wong, Balladon, Ying, and Vogel are beholden to Defendant Wu, as Defendant Wu holds the power to personally shape the Board to his whims. Indeed, the 2023 Proxy Statement maintains "that any increase or decrease in the number of directors will require the affirmative vote of the Wu Directors." Further, Defendant Wu is empowered to "nominate for election to the Board at every meeting of the stockholders of the Company at which directors are elected a number of individuals (rounded up to the nearest whole number) equal to (a) the total number of directors, multiplied by (b) the quotient obtained by dividing the shares of common stock beneficially owned by Mr. Wu by the total number of outstanding shares of common stock (each, a "Wu Director") less the number of Wu Directors then serving on the Board and whose terms in office are not expiring at such meeting." Thus, Defendants Zheng, Wong, Balladon, Ying, and Vogel cannot independently and disinterestedly consider a demand against themselves and Defendant Wu. Thus, demand is further excused as to Defendants Zheng, Wong, Balladon, Ying, and Vogel.

157.     Defendants Wong, Balladon, and Ying (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for, *inter alia*, monitoring the Company's system of internal controls, reviewing their adequacy on an ongoing basis, and recommending to the Board remedies to any identified deficiencies. The Audit Committee Defendants failed to adequately oversee the Company's internal controls, failed to identify or remedy deficiencies with the Company's internal controls, and thus failed prevent the Company from issuing false and misleading statements to the public and the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

158.     In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to act with honesty and integrity; failed to provide the SEC and public with complete, fair, accurate, timely, and understandable disclosures; failed to comply with applicable laws and regulations; failed to act in good faith, responsibly with due care and diligence and without misrepresentation or omission of material facts; failed to promote ethical behavior at the Company; and failed to promptly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

159.     Microvast has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Microvast any part of the damages Microvast suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

160.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

161.     The acts complained of herein constitute violations of fiduciary duties owed by Microvast's officers and directors, and these acts are incapable of ratification.

162.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Microvast. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue the Director-Defendants or certain of the officers of Microvast, there would be no directors'

and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

163.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Microvast to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

164.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

165.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

166.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

167.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

168.     Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose, *inter alia*: (1) contrary to the 2023 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements to the investing public, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly interested in their re-election to the Board to allow themselves to continue breaching their fiduciary duties to Microvast.

169.     The 2023 Proxy Statement also failed to disclose that: (1) there was a considerable likelihood that Microvast would not receive the DOE Grant after the DOE conducted due diligence on the Company; (2) negotiations between Microvast and the DOE had concluded and the DOE Grant offer was revoked; (3) Microvast overstated its business prospects and; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Microvast's public statements were materially false and misleading at all relevant times.

170.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement was materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination

in the 2023 Proxy Statement, including but not limited to, the reelection of Defendants Wong and Whittingham to the Board and ratifying Deloitte Touche Tohmatsu Certified Public Accountants LLP as independent auditor for the fiscal year ending December 31, 2023.

171.    The false and misleading elements of the 2023 Proxy Statement led to, among other things, the reelection of the Defendants Wong and Whittingham, which allowed them to continue to breach their fiduciary duties to the Company.

172.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

173.    Plaintiff, on behalf of Microvast, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

174.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Microvast's business and affairs.

176.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

177.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Microvast.

178.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or

omissions of material fact that failed to disclose, *inter alia*, that: (1) there was a considerable likelihood that Microvast would not receive the DOE Grant after the DOE conducted due diligence on the Company; (2) negotiations between Microvast and the DOE had concluded and the DOE Grant offer was revoked; (3) Microvast overstated its business prospects and; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Microvast's public statements were materially false and misleading at all relevant times.

179. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

180. Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

181. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Microvast's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

182. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

183.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Microvast has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

184.    Plaintiff on behalf of Microvast has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

185.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

186.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Microvast.

187.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Microvast that was tied to the performance or artificially inflated valuation of Microvast, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

188.    Plaintiff, as a shareholder and a representative of Microvast, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

189.    Plaintiff on behalf of Microvast has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

190.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191.  The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Microvast, for which they are legally responsible.

192.  As a direct and proximate result of the Individual Defendants' abuse of control, Microvast has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

193.  Plaintiff on behalf of Microvast has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

194.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

195.  By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Microvast in a manner consistent with the operations of a publicly-held corporation.

196.  As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Microvast has sustained and will continue to sustain significant damages.

197.  As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

198.  Plaintiff on behalf of Microvast has no adequate remedy at law.

### SIXTH CLAIM

**Against the Individual Defendants for Waste of Corporate Assets**

199.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

200.     The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

201.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Microvast to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

202.     As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

203.     Plaintiff on behalf of Microvast has no adequate remedy at law.

### SEVENTH CLAIM

**Against Defendants Wu and Webster for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

204.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

205.     Microvast, and Defendants Wu and Webster are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Wu's

and Webster's willful and/or reckless violations of their obligations as officers and/or director of Microvast.

206. Defendants Wu and Webster, because of their positions of control and authority as CEO, Chairman and, CFO, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Microvast, including the wrongful acts complained of herein and in the Securities Class Action.

207. Accordingly, Defendants Wu and Webster are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

208. As such, Microvast is entitled to receive all appropriate contribution or indemnification from Defendants Wu and Webster.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Microvast, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Microvast;

(c) Determining and awarding to Microvast the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Microvast and the Individual Defendants to take all necessary

actions to reform and improve Microvast's corporate governance and internal procedures to comply with applicable laws and to protect Microvast and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2.  a provision to permit the shareholders of Microvast to nominate at least three candidates for election to the Board;

      3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

    (e)     Awarding Microvast restitution from Individual Defendants, and each of them;

    (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)     Granting such other and further relief as the Court may deem just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury.

 Dated: January 31, 2024                Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

<u>/s/ Saadia J. Hashmi</u>
Saadia J. Hashmi
SDTX Bar No. 3871412
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Denish Bhavsar, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this <u>29</u> day of January, 2024.

*Denish Bhavasar*

925339D77A404FC...

Denish Bhavsar